**Mark S. DeMarco**
Attorney At Law
100 Lafayette Street, Ste. 501
New York, New York 10013
718 239 7070
Fax 718-239-2141
MSDLaw@aol.com

August 8, 2025

Honorable Frederic Block
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

**BY ECF & ELECTRONIC MAIL**

**Re:**   *United States v. Rafael Caro Quintero*
**15 Cr. 208 (FB)**

Your Honor:

We write to respectfully request that this Court issue an order immediately lifting the Special Administrative Measures ("SAMs") that have been imposed upon Rafael Quintero by Order of the Attorney General of the United States, and for such other and further relief as the Court may deem just and proper. The SAMs imposed on Mr. Quintero unconstitutionally impair his First, Fifth, and Sixth Amendment right to free speech, to due process, to equal protection, to effective assistance of counsel, to develop and present a defense, and to conduct meaningful investigation. **See Defendant's Exhibit A, Special Administrative Measures.**

Accordingly, for the reasons detailed below, the defense moves to vacate the SAMs in full, to release Mr. Quintero from solitary confinement, and to place him in a more suitable, less restrictive unit at the MDC or elsewhere. If the Court were to deny that motion, the defense moves, in the alternative, to vacate or modify various sections and provisions of the SAMs. The government's justification for the SAMs does not satisfy the requirements set forth in the authorizing regulation. Further, because the SAMs bear no relationship to a regulatory public-safety or penological goal, they amount to unconstitutional punishment. If the Court is not inclined to grant the relief herein requested, the defense further requests that an evidentiary hearing be held pursuant to *Turner v. Safley*, 482 U.S. 78 (1987).

**FACTUAL BACKGROUND**

**Rafael Caro Quintero**

Mr. Quintero is 71 years old ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮

▪ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Hon. Frederic Block
August 8, 2025

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Since his arrival in this district in February 2025, his only contact with family has been one or two briefly monitored telephone calls with family in Mexico. Mr. Quintero's only visitors have been his court appointed defense team. Further, since the imposition of the SAMs, Mr. Quintero has not been permitted even indirect contact with his family since his defense team is prohibited from disseminating communications from him to third parties. (SAMs § 2(d)).

Mr. Quintero is essentially confined to a small, windowless cell. He remains in this cell alone for 23 hours a day Mondays through Fridays; on the weekends, he is confined 24 hours a day and not permitted any exercise. His meals are passed through a slot in the door; he eats alone. The light is always on. With erratic air-conditioning, he often lacks enough warm clothing or blankets to avoid shivering.

Except for visits from his legal team, Mr. Quintero is completely isolated.[2] He is prohibited from sharing a cell or communicating in any way with other inmates. (SAMs § 6(a) and (b)). Mr. Quintero is a native Spanish speaker; he does not speak English. At certain periods such as nights and weekends, his housing unit appears to be staffed almost exclusively with guards unable to communicate in Spanish. Besides an occasional incidental interaction with a Spanish-speaking correctional officer, Mr. Quintero must communicate with these guards through gestures. His legal visits are essentially his only contact with the outside world. For Mr. Quintero, who struggled to complete the first grade after numerous attempts, reading material is severely limited by the SAMs. (SAMs §§ 8 and 9). Further, while Mr. Quintero is authorized under the SAMs to watch television, there is no television in his cell and none available for purchase in the commissary. (SAMs § 8(b)). Although he has purchased a radio, he rarely uses it since all stations that are picked up are English-speaking.

Mr. Quintero ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



28 C.F.R. § 501.3 authorizes the government to impose "special administrative measures" on a defendant if the Attorney General concludes there is a "substantial risk" the defendant will abuse third-party contacts to kill or injure others. 28 C.F.R. § 501.3(a). In this case, the SAMs imposed on Mr. Quintero comprehensively limit Mr. Quintero's third-party communications and also

─────────────

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[2] Although a member of the clergy occasionally checks in on him by tapping on his cell window, Mr. Quintero has not been permitted to attend religious services.

[3] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Hon. Frederic Block
August 8, 2025

regulate how the defense team may share information with Mr. Quintero and all third parties. But these limitations may pass regulatory muster only if the Court determines the government has offered information sufficient to trigger 28 C.F.R. § 501.3(a). Similarly, the SAMs may be deemed constitutional only if the Court finds they are not exaggerated responses to the legitimate penological and public safety concerns 28 C.F.R. § 501.3 was designed to address. *Turner v. Safley*, 482 U.S. 78, 87 (1987).

The mere nature of the charges against Mr. Quintero are insufficient to satisfy the requirements of 28 C.F.R. § 501.3. Standing alone, the charges themselves do not establish (1) a "substantial risk that [Mr. Quintero's] communications or contacts with persons could result in death or serious bodily injury" (§ 501.3(a)), or (2) create a "reasonable suspicion" that Mr. Quintero "may use communications with attorneys or their agents to further or facilitate acts of terrorism" (§ 501.3(d)). And, nothing in the nature of the charges or Mr. Quintero's history implicates his communications with counsel, and thus the government cannot establish "reasonable suspicion" that Mr. Quintero will seek to transform members of his defense team into tools of terror.

Consequently, the SAMs are unwarranted because they are not supported by information sufficient to trigger either 28 C.F.R § 501.3(a) or § 501.3(d). And since they are not reasonably related to any regulatory interests, the SAMs amount to unconstitutional punishment. *See Bell v. Wolfish*, 441 U.S. 520, 539 (1979) (holding that "if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the government action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees."). The SAMs also deprive Mr. Quintero of due process by eliminating his ability to demonstrate a positive adjustment to prison life – "an aspect of his character that is by nature relevant to the [capital] sentencing determination" (*Skipper v. South Carolina*, 476 U.S. 1, 7 (1986)) – and baselessly constrain the defense team's investigation and preparation of a defense in violation of Mr. Quintero's Sixth Amendment rights.

### Effects of Solitary Confinement

The government's imposition of the SAMs ignores the dangers that solitary confinement poses to a person's sanity. Those dangers are well-researched and well-known. As the Court of Appeals for the Third Circuit recently noted:

> A comprehensive meta-analysis of the existing literature on solitary confinement within and beyond the criminal justice setting found that "[t]he empirical record compels an unmistakable conclusion: this experience is psychologically painful, can be traumatic and harmful, and puts many of those who have been subjected to it at risk of long-term ... damage." Specifically, based on an examination of a representative sample of sensory deprivation studies, the researchers found that virtually *everyone* exposed to such conditions is affected in some way. They further explained that "[t]here is not a single study of solitary confinement wherein nonvoluntary confinement that lasted for longer than 10 days failed to result in negative sychological effects." And as another researcher elaborated, "all [individuals

Hon. Frederic Block
August 8, 2025

> subjected to solitary confinement] will ... experience a degree of
> stupor, difficulties with thinking and concentration, obsessional
> thinking, agitation, irritability, andmdifficulty tolerating external
> stimuli." Anxiety and panic are common side effects. Depression,
> post-traumatic stress disorder, psychosis, hallucinations, paranoia,
> claustrophobia, and suicidal ideation are also frequent results.
> Additional studies included in the aforementioned meta-analysis
> further 'underscored the importance of social contact for the creation
> and maintenance of "self." In other words, in the
> absence of interaction with others, an individual's very identity is at
> risk of disintegration.

*Williams v. Sec'y Pennsylvania Dep't of Corr.*, __ F.3d __, 2017 WL 526483, at 11 (3d Cir. Feb. 9, 2017).

> According to Dr. Stuart Grassian, of Harvard Medical School:

> > [S]olitary confinement – that is confinement of a prisoner alone in a
> > cell for all or nearly all of the day, with minimal environmental
> > stimulation and minimal opportunity for social interaction – can
> > cause severe psychiatric harm. This harm includes a specific
> > syndrome which has been reported by many clinicians in a variety of
> > settings, all of which have in common features of inadequate,
> > noxious and/or restricted environmental and social stimulation. In
> > more severe cases, this syndrome is associated with agitation, self-
> > destructive behavior, and overt psychotic disorganization.

Stuart Grassian, *Psychiatric Effects of Solitary Confinement,* a redacted version of a declaration submitted in September 1993 in *Madrid v. Gomez*, 889 F. Supp. 1146 (N.D. Cal., 1995) *available at* http://www.probono.net/prisoners/stopsolreports/417726.Psychiatrict_Effects_of_Solitary_Confinement_1993; *see also* Laura Rovner and Jeanne Theoharis, *Preferring Order to Justice*, 61 Am. U. L. Rev. 1331, 1358-1371 (June 2012)(summarizing the literature and cases on the effects of SAMs imposed isolation, including mental and physical harm and the deterioration in a client's ability to assist in his own defense); Atul Gawande, *Hellhole*, The New Yorker (March 30, 2009); S. Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Washington University Journal of Law and Policy 325 (2006); C. Haney, *Mental health issues in long-term solitary and "supermax" confinement*, 49 Crime and Delinquency 124-156, 132 (2003)("[T]here is not a single published study of solitary . . . confinement in which nonvoluntary confinement lasting for longer than 10 days . . . failed to result in negative psychological effects. The damaging effects ranged in severity and included such clinically significant symptoms as hypertension, uncontrollable anger, hallucinations, emotional breakdowns, chronic depression, and suicidal thoughts and behavior.") The United Nations has described solitary confinement as a form of torture. *See* United Nations, *Interim Report of the Special Rapporteur of the Human Rights Council on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment* (2011) *available at* http://www.ohchr.org/Documents/HRBodies/HRCouncil/Regularsession/Session22/A.HRC.22.53_English.pdf; *accord* Human Rights Watch, *Submission to the United Nations Committee against*

Hon. Frederic Block
August 8, 2025

*Torture* (2014) *available at* http://www.hrw.org/news/2014/10/20/submission-united-nations-committee against-torture.

   In congressional testimony in the winter of 2014, Mr. Charles Samuels, Jr., then-Director of the BOP, acknowledged the hazards of solitary confinement and provided assurances that the BOP avoided them. He stated:

> Inmates placed in restrictive housing are not "isolated" as that term may be commonly understood. . . . In most circumstances, inmates placed in restrictive housing are able to interact with other inmates when they participate in recreation and can communicate with others housed nearby. They also have other opportunities for interaction with family and friends in the community (through telephone calls and visits), as well as access to a range of programming opportunities that can be managed in their restrictive housing settings.

*Reassessing Solitary Confinement: The Human Right, Fiscal, and Public Safety Consequences*, *Hearing before the Sen. Subcomm. on the Constitution, Civil Rights, and Human Rights Committee on the Judiciary* (February 24, 2014)(statement of Charles E. Samuels, Jr., Director, Federal Bureau of Prisons) *retrieved from* http://www.judiciary.senate.gov/imo/media/doc/02-25-14 SamuelsTestimony.pdf.

   Unfortunately, these reassurances do not apply to Mr. Quintero. Under the SAMs, he has no access to "programming opportunities," he may not "interact with other inmates when they participate in recreation," he may not "communicate with others housed nearby," and he has had no opportunity "for interaction with family and friends in the community" through either phone calls or visits. In short, Mr. Quintero, though presumed innocent, faces all the evils of prolonged solitary confinement.

Hon. Frederic Block
August 8, 2025

**ARGUMENT**

**The Court Has Jurisdiction to Grant Relief**

As a threshold matter, the Court has jurisdiction to proceed on the defense motion to vacate or, in the alternative, to modify the SAMs. *United States. v. Hashmi*, 621 F. Supp. 2d 76, 84-86 (S.D.N.Y. 2008) (holding that a federal pretrial detainee can move directly in district court for relief from SAMs); *accord United States. v. Savage* 2010 WL 4236867, at 3-7 (E.D. Pa. Oct. 21, 2010); *Sattar v. Gonzales*, 2010 WL 685787, at 2 (D. Colo. Feb. 23, 2010); *United States. v. Lopez*, 327 F. Supp. 2d 138, 140-42 (D.P.R. 2004). The defendant need not exhaust his administrative remedies, as he would have to for an action under the Prison Litigation Reform Act, *see* 42 U.S.C. §1997e(a), because the present motion is not an "action" within the meaning of the Act. *Hashmi*, 621 F. Supp. 2d at 85 (finding that subject matter jurisdiction existed for challenge to SAMs because the PLRA does not govern motions by pretrial detainees); *see also United States v. Savage*, 2010 WL 4236867, at 6 (E.D. Pa. Oct. 21, 2010)("[o]ur survey of the case law reveals that every court that has considered the issue has found that a motion to remove SAMs that is filed pre-trial in a defendant's criminal case is not an "action" to which the PLRA applies"); *United States v. Mohamed*, 103 F. Supp. 3d 281, 285 (E.D.N.Y. 2015) (unlike post-conviction appeals initiated by prisoners, motions filed by pretrial detainees in government-initiated actions do not constitution "actions" under the PLRA and are therefore not barred). Accordingly, the Court has jurisdiction.

The Court also has jurisdiction, pursuant to 28 U.S.C. § 2241(c), because Mr. Quintero is in custody under or by color of the United States and is committed for trial before the United States District Court for the Eastern District of New York and because his present custody and confinement violates the Constitution and laws of the United States. The federal habeas corpus statute "draws no distinction between Americans and aliens held in federal custody . . . ." *Rasul v. Bush*, 542 U.S. 466, 481 (2004).

**Applicable Framework**

The SAMs, as they are currently implemented, violate Mr. Quintero's Sixth Amendment rights to have effective assistance of counsel, develop a defense, and conduct a meaningful investigation; his Fifth Amendment right to due process; and his First Amendment right to free speech.

The applicable framework for evaluating an infringement on the constitutional rights of prisoners is the four-factor test enunciated in *Turner v. Safley*, 482 U.S. 78 (1987). The first question is whether there is a cognizable constitutional right or liberty interest that a prison policy or practice infringes. Once a right or liberty interest is established, the inquiry proceeds to whether a regulation which restricts that right is "reasonably related to legitimate penological objectives, and is therefore permissible, or whether it rather represents an "exaggerated response" to those concerns, and therefore is not permissible. *United States v. Hashmi*, 621 F. Supp. 2d 76, 86 (S.D.N.Y. 2008). To determine the validity of a prison regulation, the *Turner* test asks courts to consider the following four factors in making this determination:

1. Whether there is a valid, rational connection between the regulation

Hon. Frederic Block
August 8, 2025

and the legitimate governmental interest used to justify it;

2. Whether there are alternative means for the prisoner to exercise the right at issue;

3. What impact the desired accommodation will have on guards, other inmates, and prison resources, with an attention to whether the asserted right, if vindicated, would have a "ripple effect" on the prison; and;

4. Whether there is an absence of ready alternatives to the regulation, where the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an "exaggerated response" to prison concerns.

*Turner v. Safley*, 482 U.S. 78, 90 (1987) (factors condensed and paraphrased); *see also United States v Hashmi*, 621 F. Supp. 2d 76, 86 (S.D.N.Y. 2008).

In the context of pretrial detention, this test is slightly modified: because punishment and rehabilitation are not legitimate objectives for individuals whose cases have not yet proceeded to trial, the "legitimate penological interests" served must go "beyond the traditional objectives of rehabilitation or punishment." *United States v. El-Hage*, 213 F.3d 74, 81 (2d Cir. 2000). The *Turner* test is *not* a "least restrictive means" test– rather, the fourth factor asks "whether the prisoner has pointed to some obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a *de minimis* cost to the valid penological goal." *Overton v. Bazzetta*, 539 U.S. 126, 136 (2003).

## The Sams Are Unwarranted and Exceed Regulatory Authority

### Regulations Provide for Two Different Types of Restrictions

The regulatory basis for SAMs envisions two types of restrictions. *See* 28 C.F.R. §501.3. The first "ordinarily may include housing the inmate in administrative detention and/or limiting certain privileges . . . as is reasonably necessary to protect persons against the risk of acts of violence or terrorism." 28 C.F.R. §501.3(a). This restriction requires "a substantial risk that a prisoner's communications or contacts with persons could result in death or serious bodily injury to persons . . ." *Id*. The second type of restriction is much narrower, in both its nature and cause. It permits "appropriate procedures for the monitoring or review of communications between that inmate and attorneys . . . who are traditionally covered by the attorney-client privilege," but only "where the Attorney General specifically so orders, based on information . . . that reasonable suspicion exists to believe that a particular inmate may use communications with attorneys or their agents to further or facilitate acts of terrorism . . . ." 28 C.F.R. §501.3(d).

Here the government puts severe limits on the defense even though the Attorney General does not claim any reasonable suspicion for believing that the defendant might use his attorneys "to further or facilitate acts of terrorism." Thus, the whole set of restrictions limiting the defense lacks

Hon. Frederic Block
August 8, 2025

any regulatory basis at all. The first type of restrictions is little better. It extends beyond "limiting certain privileges" to depriving Mr. Quintero of the personal contacts and activities that any human being needs to remain sane and competent.

### **The SAMs Restrictions on Counsel Are Not Authorized under the Regulation**

The regulatory basis for SAMs requires that restrictions on the Sixth Amendment be supported by more than allegations that a defendant may engage in "acts of violence or terrorism." *Cf.* 28 C.F.R. §501.3(a). Rather, the government must articulate facts that show a "reasonable suspicion" that, but for the SAMs, counsel would assist him in such heinous conduct. *See* 28 C.F.R. §501.3(d). Discussing the analogous situation of smuggling contraband into prison, the Seventh Circuit stated:

> To justify his impairment of communication between attorneys and inmates in the name of security, a prison warden must come forward with facts which tend to support a reasonable suspicion not only that contraband is being smuggled to inmates in the face of established preventive measures, but that their attorneys are engaged in the smuggling. We ground the last requirement on our unwillingness to assume that attorneys – admittedly the partisan advocates in court of their clients' cause – are more willing or more inclined to smuggle contraband past prison officials than are other outsiders who deal directly with inmates, as well as on our recognition of the constitutional importance of the business which an attorney typically conducts with an inmate . . .

*Adams v. Carlson,* 488 F.2d 619, 631-32 (7th Cir. 1973).

The regulation's first type of restrictions "ordinarily" includes "administrative detention" and the curtailment of "certain privileges" that involve daily living, such as "correspondence, visiting, interviews with representatives of the news media, and use of the telephone . . . ." *See* 28 C.F.R. §501.3(a). Properly understood and applied by jailers, this first type of restrictions should not encroach upon the right to counsel. Indeed, a defendant's communication with counsel is not a mere "privilege"; it is a fundamental right guaranteed by the Sixth Amendment. *See generally Geders v. United States*, 425 U.S. 80, 91 (1976)(reversing and remanding because the trial court barred consultation between the defendant and his attorney during an overnight recess). The regulation sharply distinguishes between, on the one hand, circumstances that may allow for an impairment of legal representation, and those that may allow for restrictive living conditions.

Restrictions that impair attorney-client communications specifically require the Attorney General to make a finding that "reasonable suspicion exists to believe that a particular inmate may use communications with attorneys or their agents to further or facilitate acts of terrorism . . . ." 28 C.F.R. §501.3(d). The defect in the present SAMs is that they invoke the first but not the second type of restriction. The Attorney General has not issued a specific order based on an alleged reasonable suspicion that Mr. Quintero may use attorney-client communications  or  any other acts that"would entail the risk of death or serious bodily injury to persons."  Nevertheless, the SAMs

8

Hon. Frederic Block
August 8, 2025

significantly restrict the attorney-client relationship anyway.

The second section of the SAMs imposes wide-ranging restrictions on defense counsel. (SAMs § 2.) It limits which defense team members may meet with Mr. Quintero or may meet with him alone. It insists that only lawyers may disseminate the contents of the inmate's communication, leaving unclear whether and how other defense team members can make use of information originating from the defendant. It never defines critical terms, such as "messages" and "the defense". It seeks to bar reviewing with the defendant "inflammatory material," without defining such material and, by its terms, even would prevent defense counsel from providing such material even if produced in discovery or necessary to prepare the defense. While the government states that the SAMs do not authorize the government to monitor privileged attorney-client communications the ambiguous formulations in the SAMs are open to other interpretations. (SAMs § 2(g)(ii)(3)(a), fn. 4; and § 2(g)(ii)(3)(d), fn. 3).

The government has imposed these defense restrictions without any showing that Mr. Quintero would, or could, use his attorneys "to facilitate acts of terrorism," or any other acts that "would entail the risk of death or serious bodily injury to persons." 28 C.F.R. §501.3. At the risk of stating the obvious, the Court has appointed defense counsel to represent Mr. Quintero. Neither defense counsel nor their staff previously knew Mr. Quintero and the government has presented no evidence that Mr. Quintero has tried to manipulate his attorneys. Unless contained in an *ex parte* filing, the government has made no allegations concerning defense counsel's willingness to facilitate acts of terrorism or violence. Of course, we would never participate in such misconduct, and any allegations otherwise would be frivolous and could not give rise to reasonable suspicion. Despite the lack of regulatory authority, these restrictions and ambiguities put defense counsel in the unenviable position of representing their client at risk of their own prosecution.

> Should we recoil from taking steps that effective counsel would ordinarily take in fear of violating ambiguities in the SAMs?
>
> Should we rely on the government's interpretations of the SAMs only to learn later that a court disagrees?

In short, since the second section of the SAMs has no basis at all in the regulation and unlawfully burdens the right to counsel, the Court should vacate it.

### The SAMs Are Not Tailored Specifically to Mr. Quintero

The government maintains that the SAMs are reasonably necessary to prevent Mr. Quintero from committing additional crimes and are "the least restrictive means that can be tolerated" to avoid the "substantial risk that the [Mr. Quintero's] communications or contacts with persons could result in death or serious bodily injury to persons." (SAMs at 18.) However, the government has not tailored the SAMs to Mr. Quintero specifically. SAMs must be "prisoner-specific; that is, each prisoner upon whom SAMs are imposed has a set of SAMs issued for him, and him alone, based on the circumstances of his case." *See United States v. Reid*, 214 F. Supp. 2d 84, 87 (D. Mass. 2002).

The SAMs imposed on Mr. Quintero, however, are not prisoner-specific. Instead, they are

Hon. Frederic Block
August 8, 2025

substantially similar to those imposed upon other defendants – ones whose circumstances were qualitatively different. *See e.g., United States v. Stewart*, 590 F.3d 93 (2nd Cir. 2009); *In re Basciano*, 542 F.3d 950 (2d Cir. 2008); *United States. v. Tsarnaev*, No. 13-CR-10200-GAO (D. Mass. 2013). In fact, many of the measures seem designed for a defendant charged with terrorism-related crimes that, perhaps, more commonly result in the imposition of SAMs. The rationale for the SAMs limitations on Mr. Quintero's reading material appears to be to prevent him from reading material that would inspire him to commit criminal or terrorist acts. (SAMs § 2(h)(i) and at 15-17).

Similarly, the restriction on speaking to the media seems to be predicated on a belief that he may communicate, through the media, his desire for others to commit criminal acts on his behalf. *Id*. These restrictions clearly seem to be aimed at those facing terrorism charges – people who have become radicalized through viewing incendiary material and may use the media to call on their followers to commit radical acts of terror. No such allegations have been made against Mr. Quintero. There is no justifiable security reason to limit the content of Mr. Quintero's reading material. Regarding Mr. Quintero's access to the media, defense counsel is not aware of any credible allegation by the government that Mr. Quintero has used the media to facilitate any crimes.

The government does not allege that Mr. Quintero ever escaped from custody during his decades in prison. Nor do they allege any incidents involved violence or threat of force during his previous imprisonment. Nor is defense counsel aware of any allegation of violence perpetrated by Mr. Quintero during his current incarceration. Indeed, defense counsel is not aware of a single complaint in the more than four months Mr. Quintero has been in United States custody suggesting that he has been uncooperative, disruptive, or violated any BOP regulation. The same is true for Mr. Quintero's behavior during his court appearances and during his meetings with defense counsel.

The government's allegations in the Indictment, Detention Memorandum, and the SAMs, perpetuate the myths and legends that have surrounded Mr. Quintero for years. But the government has not offered any concrete examples of violence toward witnesses or continued criminal activity while in custody. Because the SAMs fail to make a factual showing that Mr. Quintero presents a danger of criminal activity or escape, their restrictions are unwarranted.

## The SAMs are Unconstitutional

Pretrial detention serves not to punish but rather to ensure public safety and the defendant's presence at trial. *See generally, Bell v. Wolfish*, 441 U.S. 520 (1979). Pretrial detainees "retain at least those constitutional rights that [the Supreme Court has] held are enjoyed by convicted prisoners," *id.* at 545, and their conditions of confinement may not be punitive. *Id*. at 535 ("[i]n evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against the deprivation of liberty without due process of law, we think that the proper inquiry is whether those conditions amount to punishment of the detainee."); *see also City of Revere v. Massachusetts General Hospital*, 463 U.S. 239, 244 (1983)(the due process rights of a pretrial detainee "are at least as great as the Eighth Amendment protections available to a convicted prisoner."). In addition, when "an institutional restriction infringes a specific constitutional guarantee, such as the First Amendment, the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security." *Bell*, 441 U.S. at 547.

Hon. Frederic Block
August 8, 2025

In Mr. Quintero's case, the SAMs violate the Constitution without a sufficient justification related to public safety or institutional security.

### The SAMs Thwart the Effective Assistance of Counsel

Effective assistance of counsel, guaranteed by the Sixth Amendment, is critical during the pre-trial stage. *E.g., Maine v. Moulton*, 474 U.S. 159, 170 (1985)("[T]o deprive a person of counsel during the period prior to trial may be more damaging than denial of counsel during the trial itself."); *Wolfish v. Levi*, 573 F.2d 118, 133 (2d Cir. 1978)("[O]ne of the most serious deprivations suffered by a pretrial detainee is the curtailment of his ability to assist in his own defense."), *rev'd on other grounds Bell v. Wolfish*, 441 U.S. 520 (1979); *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1051 (8th Cir. 1989)(when access to counsel "is inadequately respected during pre-trial confinement, the ultimate fairness of their eventual trial can be compromised."). The Supreme Court has stated that "[r]egulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts are invalid." *Procunier v. Martinez*, 416 U.S. 396, 419 (1974), *overruled in part on other grounds Thornburgh v. Abbott*, 490 U.S. 401, 419 (1989). Government-imposed restrictions that interfere with defense counsel's ability to conduct a meaningful investigation and present a defense are grounds for reversing a criminal conviction. As explained in Professor LaFave's leading treatise on criminal procedure:

> The "right to the assistance of counsel," the Supreme Court noted in *Herring v. New York*, "has been understood to mean that there can be no restrictions upon the function of counsel in defending a criminal prosecution in accord with the traditions of the adversary fact finding process." Accordingly, state action, whether by statute or trial court ruling, that prohibits counsel from making full use of traditional trial procedures may be viewed as denying defendant the effective assistance of counsel.

> In considering the constitutionality of such "state interference," courts are directed to look to whether the interference denied counsel "the opportunity to participate fully and fairly in the adversary fact finding process." If the interference had that effect, then both the overall performance of counsel apart from the interference and the lack of any showing of actual outcome prejudice become irrelevant. The interference in itself establishes ineffective assistance and requires automatic reversal of the defendant's conviction.

Wayne R. LaFave, et al., *Criminal Procedure* §11.8(a)(3d ed. 2012)(citations omitted).

The SAMs here severely impair defense counsel's ability to conduct a meaningful investigation and prepare a vigorous defense. Each of the following restrictions unconstitutionally prejudices Mr. Quintero's Sixth Amendment rights and, therefore, is grounds for the Court to vacate, or modify, the SAMs.

Further and more importantly, the nature and the volume of the government's discovery

Hon. Frederic Block
August 8, 2025

production, coupled with the limitations on counsel's visits, have and will continue to greatly impede any necessary preparation, including trial preparation. The government has produced a vast amount of computerized materials. The defendant has been unable to review certain of these materials due to the limitations of the equipment provided for his use. He is also limited in the access he has to the equipment. In addition, the nature of the visits prevent counsel and Mr. Quintero from effectively reviewing particular documents or other materials together. Thus, the SAM has significantly prevented the ability of defense counsel to review documents and other materials with Mr. Quintero in a comprehensive manner. *See Geders v. United States*, 425 U.S. 80, 92 (1976).

Beyond mere inconvenience, certain of the !imitations implicate the ability of counsel to advocate zealously on behalf of his client. For example, the limitation on counsel's ability to rely on paralegals, investigators, and other staff to meet with the defendant, or to share information freely with them prevents counsel from having their staff or the investigator employed by the defense communicate as they see fit with experts or witnesses.

Similarly, the requirement of § 2(h)(i) and (ii) of the **SAM** that certain documents provided by counsel to the client must be precleared by U.S. Attorney and the FBI expressly infringes upon the defense's ability to fully investigate all aspects of a defense and prevents the preparation for trial as materials will be reviewed by opposing counsel that may not be intended for trial but are important items to be discussed with Mr. Quintero. Essentially, the defense must disclose its defense to the government prior to trial.

Section 2(h) is illustrative of the perils inherent in the broad wording of the SAM. This section states defense counsel cannot show his client any "inflammatory materials'. The phrase "inflammatory materials" is not defined in any way.

### Limitation on the "Dissemination" of Communications

The SAMs bar anyone except Mr. Quintero's counsel from "disseminat[ing] the contents of Mr. Quintero's communications to third parties . . . ." (SAMs § 2(d)). This provision is both overbroad and vague, for it leaves obscure the meaning of dissemination. Furthermore, this provision allows dissemination for "the sole purpose of preparing the inmate's defense – and not for any other reason." *Id.* This limitation is also vague and, and thus overly restrictive, leaving obscure the meaning of "defense."[4]

---

[4] This limitation is also inconsistent with the section governing Legal Mail, which states that counsel "may not send, communicate distribute, or divulge the inmate's mail, or any portion of its contents (legal otherwise), to third parties," without exception (SAMs § 2(i)). Read together, these two sections allow counsel to share information obtained from Mr. Quintero in person or by phone "for the purpose of preparing the defense," but prohibit counsel from sharing that very same information by mail under any circumstances for any purpose. Such disparate treatment of information obtained from Mr. Quintero based on the medium of communication is confusing, difficult to follow, and arbitrary and capricious. Counsel should not have to forego using valuable information from their own client.

Hon. Frederic Block
August 8, 2025

The "dissemination" of information is inevitable in any "investigation." Defense counsel routinely seek information from clients and use that information. Investigators, experts, and researchers may rely on such information and incorporate it into their inquiries. Fortunately, the government seems to agree: "The inmate's attorney may disseminate the contents of the inmate's communication to third parties for the sole purpose of preparing the inmate's defense . . ." (SAMs § 2(d)). But the language of the SAMs is unclear and too restrictive. If investigators, experts, and researchers cannot disseminate information learned from Mr. Quintero, they cannot conduct the complete inquiries needed to develop and present a defense and to provide the effective assistance of counsel required by the Sixth Amendment.

The limitation of "dissemination" to Mr. Quintero's counsel is unreasonable. Counsel cannot personally act as their own investigators, experts, and researchers. The charged offense conduct allegedly took place in various parts of the United States as well as Mexico and Columbia. Research and investigation may require investigation in those countries with the assistance of foreign investigators and witnesses. Such persons assisting with the investigation of the allegation may necessarily need to be privy to information received by defense counsel from Mr. Quintero.

One might venture a partial solution for avoiding inadvertent disclosures of communications from Mr. Quintero to third parties, namely, segregating information learned from Mr. Quintero from all other information. But that solution is impractical, if not impossible. The amount of information in this case is too vast; the ability of the mind to keep straight the origins of all information too weak. To always err on the side of caution would lure the defense into passivity rather than the zealousness that is demanded of any attorney. Nor should counsel have to fear that using information, which anywhere else they would use in the normal course of their representation, exposes them to sanctions or prosecution for violating the SAMs. *See generally United States v. Stewart*, 686 F.3d 156 (2d Cir. 2012) (affirming sentence of New York defense attorney Lynne Stewart to ten years in federal prison on charges that included violating SAMs).

In short, the SAMs provisions limiting the dissemination of communications severely impair the defense's ability to prepare a vigorous defense.

### Undue Restrictions on Defense Team Members

The SAMs limit contacts with Mr. Quintero to "precleared staff," defined as "a co-counsel, paralegal, and investigator who is actively assisting the inmate's . . . defense [and] who has submitted to a background check by the [government] . . ." (SAMs § 2(a) fn.2). But the SAMs lack an express provision for visits by outside experts retained by the defense.

The definition of "precleared staff" is unreasonably restrictive.[5] It excludes much of the

---

[5] Further, the defendant objects to the clearance process which allows the very same Assistant U.S. Attorneys assigned to prosecute Mr. Quintero to screen all prospective visitors. This condition allows Mr. Quintero's prosecutors access to information about defense strategy. For example, defense counsel routinely retain psychological or other medical experts for the purpose of conducting a forensic evaluation of a defendant. Reports prepared by such experts

Hon. Frederic Block
August 8, 2025

staff of the Federal Defenders (those who are not co-counsel, paralegals, or investigators) as well as outside experts, even if they, too, have "submitted to a background check" and received clearance. With background checks and clearances in place, there is no rational basis for making these further distinctions among those assisting counsel in the defense. Even the need for ad hoc permission for visits creates bureaucratic obstacles that unduly burden Mr. Quintero's Sixth Amendment right to effective assistance of counsel.

The restrictions inherent in the definition of "precleared staff" are even more irrational and antagonistic to the Sixth Amendment in light of the atypical and complicated nature of this case. Mr. Quintero's defense will call for a series of experts and consultants of the kind that no law office would have in-house. The SAMs, by restricting which members of the defense team may meet with Mr. Quintero, will necessarily delay visits by those who must meet with him to assist the defense, but fall outside the SAMs arbitrary restrictions.

In short, the SAMs provisions limiting visits by any members of the defense team unfairly burden Mr. Quintero's Sixth Amendment right to counsel.

### Irrational Distinctions Among Defense Team Members

The SAMs permit a precleared paralegal to visit Mr. Quintero without an attorney but prohibit investigators and any other defense team members from visiting him alone (SAMs §§ 2(e) and (f)). The SAMs' distinctions among defense team members are arbitrary and capricious.

The Ninth Circuit addressed this very issue. *See United States v. Mikhel*, 552 F.3d 961, 964 (9th Cir. 2009). In *Mikhel*, the Court failed to see "any valid, rational justification for distinguishing between paralegals and investigators employed by the office of the Federal Public Defender." *Id.; see also id.* ("[i]n order to be effective in providing investigative services, an investigator often needs to meet with the client."). The *Mikhel* Court then modified the SAMs to allow Federal Public Defender staff investigators who satisfied the government's preclearance requirements to meet with the defendant without defense counsel. *Id.* at 964-65. Such a change, the court found, would not impose any additional burden on the government or otherwise endanger guards, other inmates, or the allocation of prison resources. *Id.*

There is no more reason to distinguish among defense team members here than in *Mikhel*. Both paralegals and investigators must be precleared under the SAMs. (SAMs § 2(a) fn.2). Once precleared, paralegals and investigators have met the same standards of trustworthiness and have equally fulfilled the purposes of the SAMs. There is no logical reason why an investigator, like a paralegal, cannot meet alone with the defendant. The same point holds for outside experts, whose trustworthiness should be more than sufficient, once precleared, to meet alone with the defendant.

In short, the SAMs provisions that arbitrarily distinguish among those assisting in Mr.

---

may not be turned over to the prosecution or used at trial or sentencing. In such cases the prosecution has no right to know of the expert's work on the case.

Hon. Frederic Block
August 8, 2025

Quintero's defense unduly burden his Sixth Amendment right to counsel.

### Severe Limitations on Legal Phone Calls

The SAMs state that precleared defense staff may communicate with Mr. Quintero by phone, but only when an attorney is physically present and participating in the call (SAMs § 2(g)(i)). Furthermore, a translator must be in the same room as the attorney and may not participate through a conference call (SAMs § 2(b)(ii)). As of the date of this motion, the MDC has not facilitated even one legal call, though defense counsel has requested calls. In practice, these provisions prevent phone consultations – an otherwise standard form of attorney-client communication – by creating two virtually insurmountable obstacles.

First, in prohibiting precleared defense staff (whose trustworthiness is assured through preclearance) from communicating alone with Mr. Quintero by phone, this provision hardens the irrational distinctions among defense team members noted above. Second, while allowing Mr. Quintero to initiate legally privileged phone calls in theory, the SAMs render such phone calls virtually impossible in practice. As noted above, Mr. Quintero rarely is able to communicate with the staff in his unit who largely do not speak Spanish. When he has requested calls, his requests were neither granted nor communicated to the defense team.

In short, the SAMs provisions that effectively prevent Mr. Quintero from consulting with counsel by phone unduly burden his Sixth Amendment right to counsel.

### Restrictions on Third-party Communications

The SAMs bar counsel and the defense team from forwarding "third-party messages" and third-party mail to and from Mr. Quintero (SAMs §§ 2(a) and (i)). These provisions are vague, leaving the definition of "messages" obscure; they are also overbroad, barring counsel from conveying innocuous personal information to and from family members.

For a man in solitary confinement, contact with his family is critical for his mental well-being. Counsel is indispensable for helping to maintain that family contact, since his family lives abroad in Mexico. As noted above, as of the date of this letter, Mr. Quintero has had virtually no direct contact with his family since arriving in New York. While defense counsel continues to maintain contact with Mr. Quintero's family, the SAMs create doubt about what we can say beyond confirming that we have met with him. Can we convey what we otherwise would in the normal course, such as, that he is in poor health and low spirits? That he wants relatives to deposit money in his commissary account? Or that he sends his love and does not want them to worry?

There is no valid, non-punitive, reason why the SAMs should hinder defense counsel from helping Mr. Quintero convey to his immediate family personal messages, unrelated to his alleged offense conduct and which pose no security risk. These tasks are essential if counsel is to establish and maintain trust with our client and watch out for his mental well-being. By unreasonably thwarting such defense efforts, these provisions in the SAMs are fundamentally unfair and unduly burden the Sixth Amendment right to counsel.

Hon. Frederic Block
August 8, 2025

**The SAMs Violate Due Process Because They Are Punitive**

The government may not subject inmates to unnecessarily harsh and isolating conditions of confinement. *See e.g. Wilkinson v. Austin*, 545 U.S. 209, 223 (2005)(protected liberty interests are implicated where prison regulations impose "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."). Thus, SAMs are unconstitutional in the absence of a showing that there is a reasonable necessity for the harsh conditions of confinement they impose. *See* 28 C.F.R. §501.3(a)(requiring SAMs to be "reasonably necessary to protect persons against the risk of death or serious bodily injury."); *see generally* Human Rights Committee, General Comment 20, Article 7 (44th session, 1992)(prolonged solitary confinement of a detained or imprisoned person may amount to a violation of article 7 of the International Covenant on Civil and Political Rights, which aims to protect both the individual's dignity and physical and mental integrity).

Though "freedom of association is among the rights least compatible with incarceration," the right to intimate association is not "altogether terminated" by incarceration, nor is it "always irrelevant to claims made by prisoners" *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003). While, courts generally uphold SAMs restrictions on visitation and communication, the defendants in those cases, unlike Mr. Quintero, had some alternate way to communicate. *See United States v. Felipe*, 148 F.3d 101, 110–11 (2d Cir. 1998)("with respect to defendant prisoner having alternative means of communicating and associating with others, we note that he retains the right to communicate with prison employees (including pastoral, medical, and educational department staff), his attorney, and five individuals currently listed on his approved correspondence list"); *United States v. Mohamed*, 103 F. Supp. 3d 281, 291 (E.D.N.Y. 2015)("[d]efendant has alternative means of communicating wit loved ones: he can send letters and make telephone calls"); *Basciano v. Lindsay*, 530 F. Supp. 2d 435, 449 (E.D.N.Y. 2008)(government efforts to increase number of phone calls and visitations with family members weighed in favor of SAM order). *See also United States v. Ali*, 396 F. Supp. 2d 703, 709–10 (E.D. Va. 2005) ("[a]lthough he may not communicate with other inmates or non-family visitors, Defendant retains the ability to meet with and talk to his attorneys and family members.")

Mr. Quintero now lives in near-total isolation. The SAMs prohibit him from even communicating with other inmates (SAMs §§ 6 and 7). The risks of such extreme solitary confinement, for his well-being and for his sanity, are dire (*see supra*). The danger posed by Mr. Quintero's solitary confinement is worsened by the SAM's restrictions that almost completely choke off his ability to communicate with his family.

**The SAMs Restrictions on Communication with the Media Violate
the First and Sixth Amendments**

Given the widespread media attention to his case, and the tremendous number of fictionalized accounts of his life currently available and in production, the blanket prohibition on Mr. Quintero's ability to talk to the media unreasonably infringes on his First Amendment right to free speech and Sixth Amendment right to a fair and impartial jury. The restriction leaves Mr. Quintero with no ability to correct false accounts of his life that are widely available to the public.

With their blanket prohibition on non-legal communications with anyone other than immediate family members (SAMs §§ 3(a)(i); (f)(i) and 4), the SAMs unduly burden free speech and association rights. *E.g., Mohammed v. Holder*, 2011 WL 4501959, at 7-10 (D. Colo. 2011)(holding that the inmate's evidence was sufficient for a *prima facie* case that the SAMs that limited his communications to a narrow and specific list of persons violated the First Amendment); *Hale v. Ashcroft*, 2008 WL 4426095, at 4 (D. Colo. 2008)(SAMs' restrictions on communications with family members clearly "impaired" his "First Amendment interests"). The restrictions in the SAMs on group prayer also infringe on Mr. Quintero's right to the free exercise of his religion. (SAMs § 5(a)). *See e.g., Reid* v. *Wiley*, 2009 WL 1537879, at 3-7 (D. Colo. 2009)(denying a motion to dismiss a free exercise claim by a prisoner denied group prayer under SAMs).

Since the SAMs here violate Mr. Quintero's rights to free speech, association, and free exercise of religion, they should vacated or modified by this Court.

## **CONCLUSION**

We respectfully request that the Court vacate the SAMs in full, release Mr. Quintero from solitary confinement, and place him in a significantly less restrictive unit at the MDC or elsewhere. Alternatively, the Court should vacate and/or modify certain sections and provisions of the SAMs. Further, if the Court is not prepared to grant the relief herein requested without further inquiry, the defendant requests an evidentiary hearing pursuant to *Turner v. Safley*, 482 U.S. 78 (1987); *United States v. El-Hage*, 213 F.3d 74, 82 (2d Cir. 2000); *see also United States v. Hashmi*, 621 F. Supp. 2d 76, 86 (S.D.N.Y. 2008).

Thank you for your attention to this matter.

Respectfully submitted,

*Mark S. DeMarco*

Mark S. DeMarco
Elizabeth Macedonio
Victor Abreu
James McHugh
Anna Christensen
Attorneys for Rafael Caro Quintero

enc.
cc:    All Counsel
       By ECF & Electronic Mail