FJN/SK/ADW/CWE/MG
F.#2015R00471/OCDETF #NY-NYE-777

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                            Docket No. 15-CR-208 (FB)

RAFAEL CARO QUINTERO,
    also known as "RCQ," "Cesar,"
    "Don Rafa," "Rafa," "El Senor," "28,"
    "R1," "Compa," "El Hombre," "El
    Pleve," "El Canoses," "El Crespo," and
    "the Old Man,"

                  Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION TO VACATE OR
MODIFY SPECIAL ADMINISTRATIVE MEASURES

JOSEPH NOCELLA, JR.
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Francisco J. Navarro
Saritha Komatireddy
Andrew D. Wang
Chand Edwards-Balfour
Miranda Gonzalez
Assistant U.S. Attorneys
    (Of Counsel)

1

<u>PRELIMINARY STATEMENT</u>

The government respectfully submits this memorandum of law in opposition to the defendant Rafael Caro Quintero's (the "defendant" or "Caro Quintero") Motion to Vacate or, in the Alternative, Modify Special Administrative Measures ("SAMs"), dated August 8, 2025 ("Def. Br."). (<u>See</u> Dkt. No. 129). The defendant argues that the SAMs should be vacated or modified on the grounds that the SAMs unconstitutionally impair his First, Fifth, and Sixth Amendment rights to free speech, to due process, to equal protection, to effective assistance of counsel, to develop and present a defense, and to conduct meaningful investigation. As set forth below, the defendant's arguments are without merit. The SAMs in this case are appropriately tailored to the significant security concerns posed by the defendant and are similar to SAMs restrictions that have been upheld in other cases. The Court should deny the motion and uphold the SAMs without modification.

As an initial matter, the Court should reject these claims on jurisdictional grounds because the defendant has failed to exhaust his administrative remedies. Furthermore, the defendant's claims are unpersuasive because the SAMs comply with 28 C.F.R. § 501.3 and do not infringe upon any of the defendant's constitutional rights. The SAMs were created for individuals like the defendant. Caro Quintero was a senior leader and member of one of the largest drug cartels in history, which is a designated foreign terrorist organization; has spent years fleeing from justice; has operated his organization both while in and out of custody; and has employed violence, kidnapping, and torture through third parties to retaliate against witnesses and law enforcement. There is a substantial risk that the defendant's communications or contacts with persons associated with his drug trafficking organization and certain other third parties could result in death or serious bodily injury to persons, including potential witnesses in this case.

I.    The Charged Offenses

On July 26, 2018, a grand jury sitting in the Eastern District of New York returned a third superseding indictment (the "Indictment") in this case.   The Indictment, which spans approximately four decades of Caro Quintero's criminal conduct, charges Caro Quintero in Count One with leading a Continuing Criminal Enterprise, in violation of Title 21, United States Code, Sections 848(a), 848(b), and 848(c), for his role as a leader of the Guadalajara Cartel, also known as "La Federación," which later evolved into the modern day Sinaloa Cartel, the largest drug trafficking organization in the world and a designated foreign terrorist organization.   Count Two charges Caro Quintero with participating in an international conspiracy to distribute marijuana, knowing and intending that the narcotics would be illegally imported into the United States, in violation of Title 21, United States Code, Sections 959(d), 960(b)(1)(G), and 963.   Count Three charges Caro Quintero with participating in an international conspiracy to distribute heroin, methamphetamine, and cocaine, in violation of Title 21, United States Code, Sections 959(d), 960(b)(1)(A), 960(b)(1)(B)(ii), 960(b)(1)(H), and 963.

The Indictment also charges Caro Quintero in Count Four with the unlawful use of one or more firearms in furtherance of his drug trafficking crimes, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(i), 924(c)(1)(A)(ii), 924(c)(1)(A)(iii) and 924(c)(1)(B)(ii).

If convicted of Count One alone, Caro Quintero faces a mandatory minimum sentence of life imprisonment.   Each of the other counts carries a mandatory minimum of 10 years' imprisonment and a maximum of life imprisonment.

II.    Caro Quintero's Leadership of the Drug Trafficking Organization from Within and Outside of Prison

The defendant co-founded the Guadalajara Cartel with several other major drug traffickers, and it became the dominant drug cartel in Mexico in the 1980s.   The defendant's drug organization and other groups under the Guadalajara Cartel umbrella trafficked enormous quantities of marijuana and cocaine into the United States.   The defendant's prolific drug trafficking eventually earned him the nickname "El Narco de Narcos," or "the Narco of Narcos."   The defendant's drug trafficking organization also trafficked large amounts of heroin and methamphetamine into the United States.

As part of his efforts to protect his drug trafficking organization, the defendant ordered the kidnapping, torture, and murder of a U.S. law enforcement agent.   Drug Enforcement Administration ("DEA") Special Agent Enrique "Kiki" Camarena was assigned to the DEA resident office in Guadalajara, Mexico, in the early 1980s.   The defendant believed that Special Agent Camarena was responsible for leading the Mexican government to seize Caro Quintero's marijuana ranch in Chihuahua, Mexico, the Rancho Búfalo.   In February 1985, Special Agent Camarena and a Mexican pilot, Alfredo Zavala Avelar, who had been working with the DEA, were kidnapped, tortured, and murdered by members of the defendant's criminal organization.   Shortly after Special Agent Camarena's and Zavala Avelar's murder, the defendant fled Mexico.   In April 1985, the defendant was arrested in Costa Rica.   The defendant was subsequently repatriated to Mexico and convicted there for his role in the death of Special Agent Camarena and Zavala Avelar, as well as for drug trafficking.   A Mexican court sentenced the defendant to 40 years' imprisonment, but he was released from prison in 2013 before serving his full sentence.   Shortly

after his release, a higher Mexican court ordered the defendant to return to custody. The defendant did not surrender to authorities and instead remained a fugitive until his capture in 2022.

During his imprisonment in Mexico, the defendant continued to run his drug trafficking organization through members of his family, including his brother Miguel Ángel Caro Quintero. The government anticipates that the evidence at trial will establish that when the defendant was in prison, he met with co-conspirators to direct the operation of the defendant's drug trafficking organization. For example, the defendant gave orders to subordinates regarding the operation of marijuana ranches and the distribution of drug proceeds. In short, the defendant has demonstrated his willingness to engage in serious criminal conduct through third parties while imprisoned.

The risks the defendant poses from prison are further evidenced by his own public statements and evidence made public during a trial in the Central District of California in 1988. For example, during a public interview in 1985, while in custody in Mexico, the defendant boasted that he had access to "everything" while in prison and spent his time playing and doing other things he wanted to do.[1] Further, during testimony in a trial in 1988, former DEA Special Agent Dale Stinson described meeting the defendant while he was in prison in Mexico. Special Agent Stinson testified about the defendant's influence and autonomy at the prison and described how inmates

---

[1] Notably, according to public reporting, in October 1987, Mexican authorities discovered and disrupted an attempt by the defendant to escape from a high-security penitentiary through a "professionally excavated tunnel" that had been "burrowed through 780 feet of hard soil to a point below the cell block where [the defendant] and many of his associates [were] detained." William A. Orme Jr., Mexican Drug Kingpin's Jailbreak Plan Foiled, Washington Post, Oct. 9, 1987, https://www.washingtonpost.com/archive/politics/1987/10/10/mexican-drug-kingpins-jailbreak-plan-foiled/c983fddb-0133-4319-b9a5-6d08ff56fe6a/

acting on behalf of the defendant forcibly removed Special Agent Stinson from the prison at the defendant's request despite the presence of prison officials.[2]

After his release from prison in 2013, the defendant immediately went into hiding and continued to personally lead his drug trafficking organization. Between 2014 and 2017, law enforcement lawfully intercepted a large volume of electronic messages exchanged between members of the defendant's organization. In those messages, the defendant's subordinates used coded language to discuss efforts to protect the defendant from being captured by law enforcement, as well as drug trafficking and acts of violence. In 2016, the defendant authorized the murder of a co-conspirator who the defendant believed to be cooperating with U.S. law enforcement against the interests of the defendant and his organization.

III.    Procedural History and SAMs Implementation

On February 27, 2025, the Mexican government transferred the defendant to the custody of the United States, and Magistrate Judge Robert M. Levy arraigned the defendant the next day. At the arraignment, Magistrate Judge Levy entered a permanent order of detention, and since that time, the defendant has been incarcerated at the Metropolitan Detention Center ("MDC") in Brooklyn, New York. On March 26, 2025, the Court held the first status conference with the defendant and designated the case as complex for Speedy Trial purposes. The next status conference is scheduled for September 18, 2025.

On March 17, 2025, just prior to the defendant's initial status conference in this case, the Attorney General approved the imposition of SAMs, pursuant to 28 C.F.R. § 501.3, based on

---

[2]    See United States v. Felix-Gutierrez, No. 87-422(A)-ER (C.D. Cal. Aug. 4, 1988). Special Agent Stinson is now deceased.

the substantial risk that the defendant's communications or contacts with people inside or outside of the prison could result in death or serious bodily injury, or substantial damage to property that would entail the risk of death or serious bodily injury. (See Def. Br., Ex. A). The Attorney General found that the SAMs are reasonably necessary to prevent the defendant from committing, soliciting, or conspiring to commit additional criminal activity. (See id. at 18). The SAMs mitigate this risk of criminal activity by restricting the defendant's access to the mail, the media, the telephone, and visitors. In general, the SAMs limit contacts and communications between the defendant and other persons based upon a determination that such communications or contacts could result in death or serious bodily injury to others. (Id.)

Notwithstanding the limits regarding third-party contacts, the SAMs clearly permit counsel and precleared staff, who have signed affirmations, to communicate with the defendant in a variety of ways to prepare his defense. (See id. at 7, ¶ 2b ("Attorney Use of Interpreters/Translators"); id., ¶ 2c ("Attorney/Client Privileged Visits"); id. at 8, ¶ 2e ("Unaccompanied Attorney's Precleared Paralegal(s) May Meet With Client"); id., ¶ 2f ("Simultaneous Multiple Legal Visitors"); id., ¶ 2g ("Legally Privileged Telephone Calls"); id. at 9–10, ¶ 2h ("Documents Provided by Attorney to Inmate"); id. at 10, ¶ 2i ("Legal Mail")). By signing the affirmation, counsel and counsel's staff agree not to forward third-party messages to or from the defendant. (See id. at 6, ¶ 2a). However, notably, the SAMs restrictions provide that counsel for the defendant "may disseminate the contents of the inmate's communication to third parties for the sole purpose of providing necessary legal services related to the inmate's defense—

and not for any other reason—on the understanding that any such dissemination shall be made solely by the inmate's attorney, and not by the attorney's staff."   (See id. at 7, ¶ 2d.).[3]

IV.    The SAMs Are Necessary Because the Defendant Previously Used Third Parties to Run His Criminal Organization from Prison

As discussed above and detailed in the SAMs order itself (see Def. Br., Ex. A), the defendant has a demonstrated history of using third parties to assist him to maintain control of his criminal organization while in custody.   That organization—originally the Guadalajara Cartel and now the Sinaloa Cartel—has a long track record of drug trafficking and acts of violence.   The government anticipates that at trial, witnesses will testify about the defendant's role as the leader of his drug trafficking organization and how, at various times before and after his imprisonment in Mexico, the defendant was personally involved in ordering acts of violence, including against potential witnesses in this case.

In light of the defendant's prior use of third parties to (1) carry out acts of violence against law enforcement agents and potential witnesses, and (2) facilitate control over his drug trafficking organization while incarcerated, the Attorney General ordered the implementation of the SAMs pursuant to 28 C.F.R. § 501.3.   Absent the SAMs, the defendant's access to unrestricted communications or unmonitored contacts with other persons would pose a substantial risk of death or serious injury to the community.

---

[3] Although under certain extreme circumstances the monitoring of attorney-client communications is permissible pursuant to 28 C.F.R. § 501.3(d), the SAMs at issue do not provide for any such monitoring.

## V.   Implementation of the SAMs

Since the government implemented the SAMs, it has made every effort to accommodate defense counsel meetings with the defendant.   To date, sixteen individuals have been approved to visit the defendant (including attorneys, as well as numerous paralegals, investigators, a mitigation specialist, interpreters, and his sister).   Moreover, these individuals have visited with the defendant extensively.   Many of these visits have lasted for numerous hours, with some totaling approximately seven hours per day.   Since at least May 2025, the defendant has had visits with cleared individuals for an average of over 21 hours per week.

Defense counsel has requested access for three family members to make calls with the defendant: his daughter, his sister, and his common-law wife.   His daughter and sister have been cleared, and his common-law wife is going through the clearance process.   To date, the defendant has had calls with his sister and/or daughter on June 26, July 7, and August 4, 2025.   On September 1, 2025, the defendant attempted numerous calls to a family member, but his family member did not answer.   Additionally, because the defendant's family resides outside of the United States, the MDC has approved virtual video visits for the defendant to have with his approved family members, in lieu of in-person visits.   To date, defense counsel has not requested approval for any other family member to visit or call the defendant.   ████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████.[4]

---

[4] These sentences have been redacted because they discuss the defendant's private health care records.

The defendant also makes a number of claims regarding his conditions of confinement (e.g., the size of his cell, the lack of a window, eating alone, confinement hours, the inability to communicate in Spanish with guards at all hours, the lack of warm clothing and blankets for when he is cold, and lack of exercise, among others). (See Def. Br. 2). But the defendant's complaints do not tell the full story. For example, the defendant is given recreational time to exercise each week, he was provided with blankets, and he purchased numerous sweatshirts and sweatpants in commissary. Notably, the defendant has additional money in his commissary account available so he may purchase additional clothing items should he desire them. Further, as the defendant acknowledges, he has a radio in his cell, but the fact that the defendant chooses not to listen to available channels because they are in English is not something the government can address for him given that he is in an English-speaking country.[5] Since his arrival in the United States, the defendant has not filed any Requests for Administrative Remedies with the MDC through the Administrative Remedy Program, through which he is allowed to submit requests in Spanish. Lastly, the defendant is one of at least six Spanish-speaking inmates in the SAMs unit, all of whom have access to numerous Spanish-speaking staff or staff who have access to translation services, including a counselor who assists them with daily activities and requests. Notably, the other Spanish-speaking SAMs inmates who are being held under similar conditions at the MDC have not filed complaints similar to those of the defendant or judicially challenged the SAMs.

---

[5] The government also notes that there are multiple radio stations in the New York City area that regularly broadcast Spanish-language programming, including news and music.

<u>ARGUMENT</u>

I.     <u>The Court Lacks Jurisdiction to Entertain Defendant's Motion Because He Has Failed to Exhaust His Administrative Remedies as Required by the SAMs</u>

        Prior to bringing a motion to vacate an order imposing SAMs in federal court, a defendant must exhaust his administrative remedies within the Bureau of Prisons ("BOP") system. The authority to impose SAMs stems from the Attorney General's authority over the federal penal system, which the Attorney General has delegated to the BOP. <u>See</u>, <u>e.g.</u>, 18 U.S.C. §§ 3621, 4401(b), 4042. The BOP establishes the conditions of confinement for all persons in its custody pursuant to BOP regulations and policies. The regulations govern inmate communications and contacts, among other conditions of confinement. The severity of the conditions of confinement depends upon where the prisoner is housed, as well as the type of crime for which an individual is incarcerated. The BOP may impose SAMs based on violence or terrorism-based concerns pursuant to 28 C.F.R. § 501.3.

        The Prison Litigation Reform Act ("PLRA") expressly states that, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that this jurisdictional requirement, known as "exhaustion," is mandatory. <u>Porter v. Nussle</u>, 534 U.S. 516, 524 (2002); <u>see also</u> <u>Booth v. Churner</u>, 532 U.S. 731, 739 (2001). The exhaustion of remedies requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes. <u>Porter</u>, 534 U.S. at 532. The Supreme Court noted that Congress described the cases covered by the exhaustion requirement as "action[s] . . . brought with respect to prison conditions." <u>Id</u>. at 525 (alteration in original). The Court reasoned that Congress enacted the

broad reaching exhaustion requirement "to reduce the quantity and improve the quality of prisoner suits," noting that this would give corrections officials "time and opportunity to address complaints internally before allowing the initiation of a federal case."   Id.; accord United States v. Al-Marri, 239 F. Supp. 2d 366, 367-68 (S.D.N.Y. 2002) ("The Supreme Court's decision in Porter . . . makes clear that courts should not intervene in matters regarding prison conditions until corrections officials had had the time and opportunity to address such complaints internally.").

The Second Circuit has held that a prisoner must exhaust his administrative remedies before challenging SAMs in federal court.   See United States v. Yousef, 327 F.3d 56, 165 (2d Cir. 2003) ("Yousef must exhaust his administrative remedies under the Bureau of Prisons Administrative Remedy Program with regard to whatever special administrative measures are imposed on him.").   Numerous courts, including the Supreme Court, have upheld the requirement for an inmate to exhaust administrative remedies under this statute.   See Porter, 534 U.S. 516; Booth, 532 U.S. 731; accord United States v. Ali, 528 F.3d 210, 244 (4th Cir. 2008) ("The defendant must exhaust his administrative remedies before challenging the SAMs in federal court."); Yousef v. Reno, 254 F.3d 1214, 1221-22 (10th Cir. 2001).

While Porter, Yousef, Booth and other cases cited supra addressed the exhaustion requirement in the context of claims brought by convicted inmates, several courts within the Second Circuit, including within this district, have held that pretrial inmates must likewise exhaust their administrative remedies prior to filing an action in federal court.   For example, in United States v. Khan, 540 F. Supp. 2d 344, 349 (E.D.N.Y. 2007), the Honorable Dora L. Irizzary concluded that the Supreme Court has drawn no pretrial/post-trial distinction in determining when a prisoner must exhaust his or her administrative remedies before challenging his or her conditions of confinement

in federal court.   See also Miranda v. Parrinelo, No. CV1500955JMAAYS, 2017 WL 3531511, at

*3 (E.D.N.Y. July 26, 2017), report and recommendation adopted, No. 15CV955JMAAYS, 2017

WL 3524669 (E.D.N.Y. Aug. 16, 2017) ("similar to a convicted prisoner, a pre-trial detainee is

generally required to exhaust his administrative remedies prior to filing an action in federal

court."); ! United States v. Al–Marri, 239 F. Supp. 2d 366, 367, n.1 (S.D.N.Y. 2002); Baez v. Parks,

2004 WL 1052779, at *5 (S.D.N.Y. May 11, 2004) ("[T]he PLRA's strict exhaustion requirement

does indeed apply in actions brought by pretrial detainees."); but see United States v. Mohamed,

103 F. Supp. 3d 281, 285-87 (E.D.N.Y. 2015) (Kuntz, J.) (concluding that a defendant held in

pretrial detention could challenge SAMs directly with the federal court without first exhausting

administrative remedies and rejecting the challenge); United States v. Joaquin Archivaldo Guzman

Loera, No. 09-CR-466 (E.D.N.Y. May 4, 2017) (Cogan J.) (same).

      Here, the defendant has not taken any steps to exercise his rights under the

Administrative Remedy Program.   A number of the defendant's challenges to specific SAMs

restrictions are precisely the kind of claims contemplated by the Administrative Remedy Program,

and hence, as other courts have found, they are more effectively and efficiently addressed in the

first instance by the BOP.[6]   See, e.g., Al-Marri, 239 F. Supp. 2d at 367.   The exhaustion of

administrative remedies is not a mere procedural hoop through which a defendant must jump.   For

example, the defendant requested that the BOP provide him with hair clippers so that he could cut

---

[6] For example, the defendant claims that certain limitations on "equipment" have prevented
the defendant from being able to review electronic discovery.   To date, neither the government nor
BOP has received any complaints from the defendant or his attorneys regarding discovery access
issues.   To the extent there have been any issues concerning access to discovery, the defendant
should inform the government and BOP what they are so that they can be addressed.   However,
rather than try to address the alleged issues concerning access to discovery with the very parties
who would be able to assist him, the defendant raised this issue for the first time in his Motion.

13

his own hair, and the BOP provided them.   As such, the administrative process established by the Administrative Remedy Program serves as a meaningful mechanism by which the BOP may implement potential modifications to, or clarifications of, SAMs restrictions to resolve, clarify or limit conflicts.

The defendant has not satisfied the exhaustion requirement.   Based on the holdings of the Supreme Court and the Second Circuit, as well as the plain language of the PLRA, the defendant must first seek all redress available from the BOP before bringing this challenge to the Court.   Therefore, the Court should dismiss the defendant's motion without prejudice to allow for the exhaustion of administrative remedies.

II.      The SAMs Do Not Violate the Defendant's Constitutional Rights

The defendant claims that the SAMs infringe upon his due process rights and hinder his ability to prepare his own defense.   (See Def. Br. at 10–14).   Specifically, the defendant claims that the SAMs are punitive and violate his First, Fifth, and Sixth Amendment rights.   (See id. at 10–14).   The Second Circuit has rejected nearly identical claims in the past.   See, e.g., United States v. El-Hage, 213 F.3d 74 (2d Cir. 2000).   And more recently, it rejected such claims in the case against the defendant's co-conspirator and fellow Sinaloa Cartel leader Joaquin Archivaldo Guzman Loera ("El Chapo"), see United States v. Guzman Loera, 24 F.4th 144, 152-54 (2d Cir. 2022), affirming the decision of the Honorable Brian M. Cogan, see Memorandum Decision & Order, ECF No. 71 at 5, United States v. Joaquin Archivaldo Guzman Loera, No. 09-CR-466 (E.D.N.Y. May 4, 2017) (hereinafter, the "Guzman Loera SAMs Order").   The SAMs do not infringe on the defendant's constitutional rights and are warranted here because they are reasonably related to the government's interest in preventing the defendant from contacting persons associated

with his violent drug trafficking organization, and certain other third parties, who could cause death or serious bodily injury to law enforcement agents, potential witnesses, and their families. In addition, no reasonable alternative means exist. For these reasons, which are explained in detail below, the Court should reject the defendant's claims.

A.    SAMs Are Constitutional and Valid Under Established Law

It is well settled that restrictive conditions of pretrial detention may pass constitutional muster so long as they are administrative rather than punitive in nature. See United States v. Salerno, 481 U.S. 739, 746-51 (1987); Bell v. Wolfish, 441 U.S. 520, 535-40 (1979) Basciano v. Lindsay, 530 F. Supp. 2d 435, 445 (E.D.N.Y. 2008). Accordingly, "[a] court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." Bell, 441 U.S. at 538; Basciano, 530 F. Supp. 2d at 444-45; see Turner v. Safley, 482 U.S. 78, 89 (1987) (upholding regulations of inmate-to-inmate communications as reasonably related to legitimate security concerns); El-Hage, 213 F.3d at 81 (upholding similar SAMs restrictions for pretrial detainee as constitutional); United States v. Felipe, 148 F.3d 101, 110 (2d Cir. 1998) (upholding restrictions similar to SAMs as reasonable and finding no due process violation); United States v. Sattar, 272 F. Supp. 2d 348, 369 (S.D.N.Y. 2003) (upholding requirement of affirmation from an attorney as a reasonable measure for effectuating SAMs restrictions). In the absence of a detention official's express intent to punish, the court's determination "generally turns on 'whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].'" Basciano, 530 F. Supp. 2d at 445 (quoting Bell, 441 U.S. at 538-39). Thus, courts have found that a pretrial condition "will not amount to

punishment if it is reasonably related to a legitimate governmental objective, but will if it is arbitrary or purposeless." Id. (quoting Bell, 441 U.S. at 539) (quotations omitted).

The Second Circuit, in reviewing whether restrictive pretrial conditions violate a defendant's due process rights, has applied the test established in Turner. In Turner, the Supreme Court identified four factors for evaluating whether a confinement regulation is reasonable, specifically, whether: (1) a valid, rational connection exists between the regulation and the purported government interest; (2) alternative means of exercising the constitutional right at issue remain available; (3) accommodation of the right asserted by the prisoner will have a significant impact on the prisoner's fellow inmates, prison staff, or prison resources; and (4) there is an absence of ready alternatives to the regulation. 482 U.S. at 89-91; see also El-Hage, 213 F.3d at 81 (recognizing four-factor test in Turner as the standard by which the SAMs restrictions should be reviewed). The court in Turner made clear that the last factor is not a "least restrictive alternatives" test: "prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." Id. at 90-91. But, "if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." Id. at 91.

The Turner Court further recognized that courts must afford prison administrators deference in managing detention facilities as "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." Id. at 84 (quoting Procunier v. Martinez, 416 U.S. 396, 405 (1974)). Similarly, the Supreme Court has cautioned that, when determining whether a pretrial condition is reasonably related to a legitimate governmental objective, a court

must be mindful that "such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." Basciano, 530 F. Supp. 2d at 445 (quoting Bell, 441 U.S. at 540 n.23, 547). This deference can have particular significance when the restrictions at issue have been implemented for security purposes. See, e.g., Thornburgh v. Abbott, 490 U.S. 401, 407 (1989).

An analysis of the four factors in this case demonstrates that the SAMs restrictions are reasonable and neither impinge on the defendant's due process rights nor prejudice his ability to prepare his own defense.

B.     The SAMs Are Reasonably Related to a Legitimate Penological Interest

As detailed above, pursuant to 28 C.F.R. § 501.3, the Attorney General may direct the BOP to implement SAMs that are reasonably necessary to protect persons against the risk of death or serious bodily injury pursuant to the Attorney General's finding that a prisoner's communications or contacts with persons could result in death or serious bodily injury to persons. In this case, the Attorney General directed the BOP to implement SAMs with respect to the defendant because she found that there was ample evidence demonstrating a substantial risk that the defendant's communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of serious bodily injury to persons.

As described above and in the government's prior submissions, the defendant has an established history of acting through third parties to: (1) operate his vast, violent drug trafficking

organization, (2) target law enforcement, and (3) take actions to silence potential witnesses. Accordingly, based upon the Attorney General's findings in this case and the facts set forth above, there is a legitimate governmental interest in limiting the defendant's contacts and communications. See, e.g., Basciano, 530 F. Supp. 2d at 446 (finding that the government's purpose of preventing harm to those whom the defendant "may wish to harm and of inhibiting his ability to oversee the operations of the Bonanno crime family, widely known for its propensity to order and commit violent acts, are legitimate purposes") (citing El-Hage, 213 F.3d at 81-82).

The defendant's confinement conditions are reasonably related to the purpose of inhibiting his ability to harm others. Specifically, the challenged communication restrictions are reasonably necessary to ensure that others do not transmit, whether intentionally or inadvertently, forbidden messages from the defendant to third parties.[7] Courts have long recognized this concern as a legitimate justification for SAMs under section 501.3(a). See Turner, 482 U.S. at 93 ("In any event, prisoners could easily write in jargon or codes to prevent detection of their real messages."); United States v. Hammoud, 381 F.3d 316, 334 (4th Cir. 2004) ("A conversation that seems innocuous on one day may later turn out to be of great significance, particularly if the individuals are talking in code."); United States v. Johnson, 223 F.3d 665, 673 (7th Cir. 2000) ("And we know that anyone who has access to a telephone or is permitted to receive visitors may be able to transmit a lethal message in code."); United States v. Salameh, 152 F.3d 88, 108 (2d Cir. 1998) ("Because

---

[7] The defendant contends that the SAMs unfairly restrict defense counsel from communicating messages they perceive to be innocuous on the defendant's behalf. Def. Br. 15. However, to the extent the defendant seeks to transmit coded communications to third parties via counsel, the dangerous intent of such messages would presumably be clear to the recipient but obscure to the messenger. Defense counsel's subjective belief that a message may be innocuous is thus of no moment.

Ajaj was in jail and his telephone calls were monitored, Ajaj and Yousef spoke in code when discussing the bomb plot."); Guzman Loera SAMs Order at 5-6 ("Regarding the visitor and communication restrictions, the Government has expressed a reasonable concern that without such restrictions, there is a possibility that defendant may pass encoded messages to his co-conspirators, which is a concern several courts have recognized."); Basciano, 530 F. Supp. 2d at 440, 446-47 (upholding SAMs where defendant demonstrated ability to pass messages in coded language to order violence); United States v. Ali, 396 F.Supp.2d 703, 709 (E.D.Va. 2005) (taking note that "al-Qaeda trains its followers to use a variety of means to communicate with their confederates from prison"). That concern is specifically applicable here, where the government's evidence at trial is expected to include Title III intercepts of electronic messages in which members of the defendant's drug trafficking organization speak in coded language to discuss and carry out the organization's activities, including drug trafficking and acts of violence, under the defendant's leadership and direction.

Notably, the Second Circuit has affirmed similar conditions of confinement where a defendant had limited contact with prison employees, defense counsel, and five approved individuals even where, unlike here, the defendant was not alleged to have made any illegal communications from prison, because such restrictions served the regulatory purpose of preventing the defendant from communicating with his unconfined co-conspirators. El-Hage, 213 F.3d at 82. Here, the SAMs Authorization Memorandum provides ample evidence of the defendant's leadership of his drug organization, history of running his violent organization from prison, and use of co-conspirators to retaliate against law enforcement and potential witnesses. This more than demonstrates a clear rational relationship between the challenged restrictions and the legitimate

governmental purpose of safeguarding the public and preventing acts that could lead to death or serious bodily injury. In short, the SAMs are reasonably necessary to address legitimate and serious concerns about the defendant's engaging in further criminal activity, including the potential use of violence.

C.  Judge Cogan's Reasoning in the Guzman Loera SAMs Order Applies Here

The Court should reject the defendant's claims for the same reasons why Judge Cogan (and the Second Circuit) rejected similar claims brought by Joaquin Archivaldo Guzman Loera, an individual of comparable notoriety and stature in the drug trafficking world. Guzman Loera was one of the former leaders of the Sinaloa Cartel, widely regarded as one of the most powerful and violent Mexican drug cartels to ever exist and itself a successor organization to the Guadalajara Cartel that the defendant co-founded. Shortly after he was extradited to the Eastern District of New York in 2017 to face similar charges of leading a continuing criminal enterprise and drug trafficking, Guzman Loera filed a motion to vacate the SAMs that had been implemented against him, making substantially the same First, Fifth, and Sixth Amendment claims raised by the defendant here. See Guzman Loera SAMs Order at 4 (Guzman Loera "argues that he is prevented from making statements to the press and taking part in group prayer activities, which violate his First Amendment rights; that he is prevented from communicating with his family regarding the retention of private attorneys in the U.S., which violate his Sixth Amendment rights; and that his solitary confinement and the SAMs amount to a deprivation of liberty without due process, in violation of his Fifth Amendment rights").

Judge Cogan rejected Guzman Loera's request to vacate the SAMs, finding that "the Government has articulated legitimate objectives of preventing defendant from running the Sinaloa

Cartel from prison, coordinating any escape from prison, or directing any attack on individuals that he may believe are cooperating with the Government." Id. at 5. With respect to specific restrictions, Judge Cogan found that restrictions on visitors and communications were reasonable because of the "possibility that the defendant may pass encoded messages to his co-conspirators, which is a concern several courts have recognized." Id. (citing Hammoud, 381 F.3d at 334; Johnson, 223 F.3d at 673). Likewise, Judge Cogan concluded that Guzman Loera's placement in solitary confinement was reasonable under the circumstances, citing Guzman Loera's highly publicized prior escape from a Mexican prison, as well as the need to prevent the defendant from overseeing criminal activities and ordering harm against others. Id. at 6.

The same reasoning applies here. As described earlier, the SAMs against the defendant are also designed to prevent the defendant from running his drug organization from prison or directing third parties to engage in violence against potential law enforcement or civilian witnesses. Restrictions on the defendant's ability to communicate, including the defendant's separation from general population, are reasonably tailored to achieving this goal. And the defendant's separation from general population is further justified by his publicly reported attempt in October 1987 to escape from a high-security Mexican prison via an underground tunnel. Therefore, the Court should uphold the SAMs against the defendant, which are substantially similar to those implemented against Guzman Loera.

D.     The Other *Turner* Factors Support Maintaining SAMs Restrictions

The other Turner factors also weigh against vacating the SAMs and placing the defendant in general population. The BOP can address many of the defendant's concerns without the Court vacating the SAMs. Indeed, as noted above, the BOP has already taken steps to address

some of the concerns the defendant raised in his motion as well as some not included in his motion, by (1) providing him with hair clippers and (2) ensuring that non-Spanish-speaking staff members have access to translation services to be able to communicate with the defendant.

By contrast, releasing the defendant, with his well-documented history of leading a violent drug trafficking organization, into the general population, would put other inmates and prison guards at risk and would strain prison resources beyond measure. In light of the defendant's notoriety and role as a leader of one of the most prolific and powerful drug trafficking organizations in the world, the resources needed to monitor the defendant's communications with other inmates who may try to curry favor with the defendant by performing acts of violence on his behalf, or aiding in his escape, would be impossible for the BOP to provide. See Basciano, 530 F. Supp. at 449 (acknowledging that attempting to monitor defendant's communications in general population would have significant impact on prison resources and thus weigh in favor of maintaining restrictive conditions); Guzman Loera SAMs Order at 6 ("Moreover, there are no obvious alternatives to confinement in the SHU – the only alternative to the SHU is placement in the general prison population, and that is an unreasonable request for the reasons already stated."). There are no alternative means to address the penological concerns presented by the incarceration of this powerful and violent defendant.

III.  The SAMs Do Not Violate the Defendant's Sixth Amendment Right to Counsel

The defendant claims that the SAMs restrictions violate his Sixth Amendment right to counsel in two ways: (1) the SAMs attorney-client provisions are unauthorized by regulation because they are not supported by a "reasonable suspicion" that the defendant "may use communications with attorneys or their agents to further or facilitate acts of terrorism" and (2) the

parameters placed on attorney-client communications interfere with the effective assistance of counsel. (Def. Br. 7–9). The Court should reject the defendant's arguments for the reasons below.

A.  The Attorney-Client Provisions of the SAMs Are Authorized Because They Are Reasonably Related to a Governmental Objective

As noted above, the SAMs restrictions pertaining to attorney-client communications are authorized because they are reasonably related to the government's interest in limiting the defendant's contacts and communications to prevent the transmission of dangerous communications to third parties. Moreover, the defendant's argument that the SAMs restrictions are unauthorized because of the absence of "reasonable suspicion" mischaracterizes the SAMs restrictions implemented here. The reasonable suspicion standard only applies to "the monitoring or review of communications between that inmate and attorneys or attorneys' agents who are traditionally covered by the attorney-client privilege, for the purpose of deterring future acts that could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons." See 28 C.F.R. § 501.3(d). Here, the SAMs restrictions do not call for the monitoring or review of attorney-client communications, rendering the defendant's complaint irrelevant. See Guzman Loera SAMs Order at 8-9 (rejecting argument that SAMs restrictions exceeded regulatory authority under 28 C.F.R. § 501.3(d) because restrictions did "not impose any review or monitoring of any of defendant's attorney-client communications").

As detailed above, the government imposed the SAMs restrictions to prevent dangerous communications between the defendant and third parties by putting all parties on notice of the heightened security concerns relating to communications to and from the defendant, which

23

require extra diligence, particularly when disseminating any such communications. Under the circumstances of this case and because of the security concerns, the imposition of restrictions on the defendant's contacts and communications is reasonable and warranted. See Basciano, 530 F. Supp. 2d at 448 (finding imposition of SAMs "rational response to the Government's legitimate purpose" where government offered evidence of defendant's use of third parties to pass messages from prison to associates regarding affairs of defendant's criminal organization). Moreover, the affirmation required by the SAMs restrictions for defense counsel and their staff provides a reasonable measure for ensuring that the SAMs restrictions have effect, while permitting the representation to proceed undisturbed. See Hashmi, F. Supp. 2d at 87 (upholding requirement that counsel sign SAMs acknowledgment forms, noting that defense counsel "would do well to avoid the conduct that formed the basis of [another] attorney's conviction—smuggling messages from her client to co-conspirators, despite acknowledging that SAMS forbade her from doing so").

B.      SAMs Restrictions Do Not Prevent Effective Assistance of Counsel

Arguing that the SAMs thwart the effective assistance of counsel, the defendant contends that (1) the limitations on attorney-client communication are overbroad and vague (Def. Br. at 8–9, 12–13); (2) they arbitrarily make distinctions between staff members and unduly burden the defense team (Def. Br. at 13–14); and (3) they impose burdensome limits on the defendant's legal calls (Def. Br. at 14–15). The Court should reject these arguments.

1.      The SAMs Guidelines Governing Attorney-Client Communications Are Not Overbroad or Vague

The defendant erroneously claims that the SAMs restrictions on attorney-client communications are overbroad and vague. (See Def. Br. at 8–9, 12–13). The defendant injects vagueness into the plain language of the restrictions where none exists.

24

First, the defendant claims that the provision allowing only for attorneys to disseminate the contents of the defendant's communications to third parties for the sole purpose of providing necessary legal services is vague and "unreasonable" because it both: (1) leaves obscure the meaning of "dissemination" and "defense," and (2) "severely impair[s] the defense's ability to prepare a vigorous defense." (Def. Br. at 12–13, 15). These claims misstate the plain language of the provision and how it works. This provision concerns only the dissemination of the defendant's communications to third parties, not the use of information derived from the defendant's communications. The provision precludes any member of the defense team, other than the defendant's attorneys, from disseminating communications to third parties; but it does not limit how any member of the defense team (including investigators, experts, and researchers) may use such communications in the preparation of the defense once they have it. (See Def. Br., Ex. A at 7, ¶ 2d (stating that only defendant's attorneys may disseminate contents of defendant's communication to third parties for sole purpose of preparing defense, but that members of defense team other than attorneys may not disseminate such communications)). Thus, under this provision, it is up to the defense attorneys to make the legal determination as to who outside the defense team should have access to the defendant's communications for the purpose of preparing the defense. In that way, the provision ensures that such communications are carefully guarded and only distributed to third parties after appropriate consideration.

Second, the defendant claims that the term "messages" is undefined, but does not explain why the dictionary definition of message—i.e., "a communication in writing, by speech or by signals"—does not supply sufficient clarity. (See Def. Br. at 9, 15); Merriam-Webster Dictionary, Definition of Message, https://www.merriam-webster.com/dictionary/message (last

visited August 11, 2025).   Specifically, the defendant expresses concern that the SAMs prevent counsel from fulfilling its role in informing the defendant's family members about his well-being. Under the plain meaning of the SAMs, defense counsel simply is restricted from communicating a specific verbal, written or recorded message from the defendant, unaltered, to third parties. Defense counsel, however, is able to share observations about the defendant, such as his health or spirits, to his family and friends, without violating the SAMs.   For example, defense counsel may share that the defendant is in good health and wishes his family well, without passing on verbatim messages (which may or may not be coded).

Third, the defendant claims that the prohibition against providing the defendant with "inflammatory material" is overbroad and includes barring the defendant from access to discovery or material necessary for investigative purposes.   (Def. Br. at 9, 12).   There is absolutely nothing in the SAMs restrictions that bars the defendant from reviewing discovery or material necessary for defense investigation.   The SAMs restrictions do not authorize the government to monitor privileged attorney-client communications, and contrary to the defendant's contention, there is nothing ambiguous about that clause.   (See Def. Br., Ex. A, at 6–10).   Further, the only place in the SAMs in which "inflammatory material" is mentioned is in section 2(h)(i) of the SAMs, which solely addresses "documents not related to the inmate's defense."   Id.   Accordingly, because the SAMs restrictions are clear on their face, the defendant's claim that they are ambiguous is wrong.

2.    The Distinctions Among Defense Team Members Are Not Arbitrary or Unduly Restrictive

The defendant complains that the SAMs restriction that allows paralegals to visit with the defendant alone, while requiring attorneys to accompany investigators, is arbitrary.   (Def. Br. at 14).   Because of the unique security risks the SAMs address, this particular provision of the

SAMs limits the people who meet alone with the defendant to the core members of the defense team.   Considering the regular visits between the defendant and the individuals on his defense team, as well as the length of the visits by those individuals, see supra at 9, it is difficult to discern how this particular provision of the SAMs impermissibly burdens the defendant's Sixth Amendment rights.   In any event, if the defense team has a unique need for sending a non-attorney to meet with the defendant alone, they could have and still can, make the request, and the government will consider making modifications on a case-by-case basis.

Moreover, the defendant contends that the definition of "precleared staff" is unduly restrictive because it excludes visits from outside defense experts and other staff members.   (Def. Br. at 13–14).   With respect to visits by defense experts or other staff, if they submit to a background check for preclearance and defense counsel will be present for the visit, defense counsel can request to allow for their visit.   The SAMs are about preventing the defendant from engaging in dangerous behavior through third parties; thus, it would be irrational to simply allow anyone to visit the defendant without law enforcement doing basic due diligence into who they are and the purpose of their visit.[8]   Again, the government will consider such requests on a case-by-case basis.

3.   Legal Calls Are Not Unduly Restricted

In arguing that the SAMs interfere with his Sixth Amendment rights, the defendant points to the SAMs restrictions on legal calls, which require precleared staff members and interpreters to be physically in the same room as the defendant's attorney and prohibit them from

---

[8] In assisting with the clearance process, the Assistant U.S. Attorneys who are part of the clearance process do not have access to any work product related to the case nor do they request it. Defense counsel's claim that the clearance process gives the "prosecutors access to information about defense strategy" (Def. Br. At 13 n. 5) is completely without basis.

participating by conference call. (Def. Br. at 15). As proof of the SAMs' restrictiveness, the defendant points to the fact that the MDC has not facilitated any legal calls since the date of his incarceration.

Under the first Turner factor, there is an obvious government interest in limiting means by which third parties, who are not precleared, can participate on legal calls, and the restriction is reasonably related to that interest. Section 2(b)(ii) of the SAMs forbids multiple telephone connections between attorneys, precleared staff, and the defendant. While those individuals may be trustworthy, multiple telephone connections increase the risk that a non-cleared third party could overhear the conversation between the precleared parties—whether it be in-person or electronic. Such a risk is elevated if the precleared individuals participating on the telephone call with the defendant are not all physically present in the same room. Applying the remaining Turner factors, the defendant has not offered any less restrictive means of achieving the goal of preventing leaks resulting from conference calls, and the government need not show that the SAMs are the least restrictive means of meeting this goal. Hashmi, 621 F. Supp. 2d at 87 (citing Turner, 482 U.S. at 90). Thus, the restrictions to legal calls are reasonable under the circumstances.

As to the alleged lack of legal calls between the defendant and defense counsel under the current SAMs, BOP staff has advised the government that the defendant had at least one legal call with his defense counsel on August 1, 2025. Moreover, given the regular and lengthy in-person meetings between the defendant and his attorneys, as described above, the SAMs restriction on legal calls has not hindered the defendant's ability to communicate with his counsel.

IV.    The SAMs Restrictions Are Prisoner-Specific

The defendant claims that the SAMs restrictions are not specific to his circumstances and thus should be vacated.  (Def. Br. at 9–10).  But the SAMs restrictions imposed on the defendant specifically address the concerns outlined by the Attorney General in the original memorandum, dated March 17, 2025.  (See Def. Br., Ex. A).  The defendant has a history of leading an extremely violent drug trafficking organization that demonstrates that he will stop at nothing to further his own interests, including taking the life of a United States law enforcement agent and others.  The defendant also has a demonstrated history of using his representatives, associates, and family members to further his criminal enterprise.  For example, while the defendant was incarcerated in Mexico, he relied on his brother, Miguel Ángel Caro Quintero and other trusted individuals, to run the day-to-day operations of the defendant's drug trafficking organization.  Accordingly, the SAMs restrictions are specifically tailored to address the defendant's extremely serious and dangerous behavior.

The defense attempts to distinguish this case from others on the grounds that the defendant here has not done anything specific since his arrest to warrant SAMs restrictions.   (Def. Br. at 10).  This argument is unavailing.  There is nothing in the SAMs regulations or the applicable laws that suggests that SAMs only may be imposed after a particular defendant causes the very harm that the SAMs are designed to prevent.  The reasons that SAMs restrictions were imposed in this case included the defendant's behavior while in custody in Mexico and his ability to cause death or injury to others.   In a case cited by the defendant, United States v. Tsarnaev, 13-CR-10200-GAO (D. Mass. 2013), the defendant was charged with heinous crimes.   Yet other than the crimes themselves, there was nothing in the defendant's past that specifically warranted SAMs

restrictions.[9]   But in the instant case, the defendant has already proved that SAMs restrictions are necessary given his past behavior leading a drug trafficking enterprise, ordering others to commit acts of violence and drug distribution, and circumventing prison restrictions.   The government should not have to wait for the defendant to undertake further actions to justify the SAMs restrictions.   As the Second Circuit stated in Stewart:

> We have no basis upon which to entertain a doubt as to the authority of the Attorney General of the United States to ensure that reasonable measures are designed and implemented in an attempt to prevent imprisoned criminals who are considered dangerous despite their incarceration from engaging in or facilitating further acts of criminality from their prison cells. . . .   [The defendant] has demonstrated his willingness to engage in violent criminality not by acting violently himself, but by ordering, encouraging, and conspiring with others who would actually shed the blood. The likelihood that he would continue to order, direct, or encourage such acts from prison, if he could, was plain, and his incapacitation reasonably required not just his physical immobility, but also his virtual silence vis-à-vis the world at large.

Stewart, 590 F.3d 93, 111–12 (2d Cir. 2009).   SAMs restrictions are designed to prevent death or serious injury, and the Court should uphold them here because this defendant's history, characteristics, and prior conduct demonstrate that he is capable of and likely to seek to cause such harm to others.   See e.g., Guzman Loera SAMs Order at 10 ("The exact purpose of the SAMs is to prevent violence, and the Government is not limited to preventing only those acts that the defendant

---

[9] As to another case the defendant cites, In re Basciano, 542 F.3d 950 (2d Cir. 2008), the defendant in that case, like the defendant here, had a prior history of violence.   But unlike the defendant here, the scale of Basciano's organization, the Bonanno crime family, as large and powerful as it was at the time of his prosecution, is dwarfed by the global scale of the Sinaloa Cartel. Similarly, in United States v. Stewart, 590 F.3d 93, 101 (2d Cir. 2009), the defendant was a spiritual Jihadist leader that conspired to commit murders and attacks on places across New York and succeeded in at least one attack.   However, unlike the defendant here, Abdel Rahman's role was limited to "supervision and direction of membership," whereas the defendant here was directly involved in violence committed by his criminal organization.

allegedly committed previously. . . . It is both reasonable and logical that the SAMs contemplate a wide variety of scenarios so that the purpose, the prevention of harm, is met.").

V.     The SAMs Do Not Violate the Defendant's First and Sixth Amendment Rights

The defendant also claims that the SAMs restrictions violate his First and Sixth Amendment rights because (1) he cannot correct allegedly false accounts of his life that are widely available to the public, hindering his right to a fair and impartial jury under the Sixth Amendment, and (2) he is only permitted to meet with his defense team, immediate family members, and religious personnel, and cannot engage in group prayer, violating his freedom of association and religion under the First Amendment.    (See Def. Br. at 16–17).    The defendant's claims are without merit.

First, the SAMs restrictions do not violate the defendant's Sixth Amendment rights by restricting his ability to make public comments.    The defendant's counsel possesses the ability to correct any purported "false" accounts of his life to the public.    In fact, the press has also widely reported defense counsel's statements.[10]

For example, numerous news outlets reported on the instant motion.   See, e.g., Infamous Mexican drug lord caged in US prison moans about not having TV, The Mirror (August 9, 2025), available at https://www.mirror.co.uk/news/us-news/infamous-mexican-drug-lord-caged-35704736 (last visited on August 11, 2025); Caro Quintero Breaks Silence: Mexican Drug Lord Behind Kiki Camarena's Murder Speaks Out from U.S. Prison, The Latin Times (August 8, 2025), available at  https://www.latintimes.com/caro-quintero-breaks-silence-mexican-drug-lord-behind-

---

[10]  Notably, the defendant has also given multiple, prior television interviews regarding his conduct and charges.

kiki-camarenas-murder-speaks-out-us-588190 (last visited on August 11, 2025); <u>Rafael Caro</u>
<u>Quintero Publishes Letter from Brooklyn Prison, Denounces Harsh Conditions</u>, Mexico Daily Post,
(August 8, 2025), <u>available at</u> https://mexicodailypost.com/2025/08/08/rafael-caro-quintero-
publishes-letter-from-brooklyn-prison-denounces-harsh-conditions/ (last visited on August 11,
2025).

Second, the SAMs restrictions on visitation and group prayer do not violate the
defendant's First Amendment rights. The Second Circuit has repeatedly upheld SAMs restrictions
that limit an inmate's First Amendment rights where they are reasonably related to the
government's penological concerns. <u>See</u> <u>Felipe</u>, 148 F.3d at 110-11 (2d Cir. 1998) (rejecting
inmate's First Amendment argument on the ground that the SAMs restrictions permitted him to
exercise his First Amendment right in a more limited manner) (citing <u>Thornburgh</u>, 490 U.S. at 417-
18 ("The Court in <u>Turner</u> did not require that prisoners be afforded other means of communicating
with inmates at other institutions . . . . Rather it held . . . it was sufficient if other means of expression
. . . remained available.")).

In <u>Felipe</u>, the court sentenced the defendant, the former leader of the Latin Kings
gang, to life imprisonment, but he continued to engage in criminal conduct while behind bars,
including ordering the murders of gang rivals. <u>See</u> 148 F.3d at 106. Accordingly, the court
imposed special confinement conditions on the defendant, which included a total ban on
correspondence and visits with others except for his attorney and close family members approved
by the court, and the monitoring of all correspondence and visits with anyone except his attorney.
<u>Id</u>. at 107. Applying the <u>Turner</u> test, the Second Circuit concluded that his case warranted such
severe restrictions, and did not violate the defendant's First Amendment rights. <u>See</u> <u>id</u>. at 110-11.

32

Similarly, in El-Hage, where an al Qaeda-affiliated defendant was subject to pretrial SAMs restrictions similar to those here, the Second Circuit again rejected the claim that the conditions of confinement violated the defendant's First Amendment rights. See El-Hage, 213 F.3d at 81-82.

Here, as discussed in the detention memorandum, the defendant's prolific use of violence, including kidnapping, torture, and murder (including of Special Agent Camarena), and his history of operating his drug trafficking organization from within prison, justify the SAMs restrictions on the defendant's visitation and comingling with other inmates, thereby precluding group prayer.[11] Given the defendant's past conduct, consistent with the Second Circuit's decisions in Guzman Loera, Felipe, and El-Hage, any SAMs restrictions that arguably impact the defendant's First Amendment rights are valid and necessary.

VI.     The Defendant's Isolation Does Not Violate the Fifth Amendment

Throughout his brief, the defendant claims that the solitary nature of his confinement violates his Fifth Amendment right to due process. As noted above, the defendant has been visited by his counsel, paralegal, and staff members regularly since the day he arrived in the United States. The visits by defense counsel and its staff on some occasions have averaged seven hours per day. See supra at 9. In addition to these lengthy visits, the defendant regularly has the opportunity to recreate in a room equipped with exercise equipment and a window allowing for fresh air and light. "Although defendant characterizes the SAMs as imposing unnecessarily harsh and isolating conditions of confinement, these conditions are not actually atypical of solitary confinement generally." Guzman Loera SAMs Order at 6 (rejecting Guzman Loera's challenge to SAMs

---

[11] The SAMs restrictions do permit the defendant to meet with religious personnel, and defense counsel acknowledges that he has received visits from the prison's religious personnel.

restrictions and finding that "[t]he conditions are reasonably necessary to ensure that defendant cannot coordinate any escape from prison, direct any violence against cooperators, or manage any aspect of the Sinaloa Cartel's enterprise, which includes narcotics trafficking and violence").

The solitary circumstances of the defendant's confinement are the result of the defendant's own actions and reasonably related to a legitimate penological interest, as described above. Because the government implemented the SAMs to address the significant security concerns posed by the defendant, and the SAMs are reasonably related to those serious concerns, they should be upheld.

## CONCLUSION

For the forgoing reasons, the Court should deny the defendant's motion to vacate, or in the alternative, modify the SAMs.

Dated:      Brooklyn, New York
            September 15, 2025

                                              JOSEPH NOCELLA, JR.
                                              United States Attorney
                                              Eastern District of New York
                                              271 Cadman Plaza East
                                              Brooklyn, New York 11201

Francisco J. Navarro
Saritha Komatireddy
Andrew D. Wang
Chand Edwards-Balfour
Miranda Gonzalez
Assistant United States Attorneys
        (Of Counsel)